**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TEKDOC SERVICES, LLC, et al., | CIVIL ACTION NO. 09-6573 (MLC) |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| 3i-INFOTECH INC., et al., | |
| Defendants. | |

**COOPER, District Judge**

The plaintiffs, Lou Ann Naples ("Naples") and TekDoc Services, LLC ("TekDoc") (collectively, "Plaintiffs"), bring this action against the defendants, 3i-Infotech Inc. ("Infotech", formerly known as Innovative Business Solutions, Inc. ("IBSI")) and Ranbaxy, Inc. ("Ranbaxy"). (See generally dkt. entry no. 95, 2d Am. Compl.)[1] Plaintiffs assert claims against Infotech and Ranbaxy for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, innocent misrepresentation, fraud in the inducement, negligent misrepresentation, and negligent infliction of emotional distress. (Id. at 1-9, 10-17.) They also assert a claim against Infotech for alleged violations of the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110(a), et seq. ("CUTPA"). (Id. at 9.)

---

[1] The Court acknowledges that Plaintiffs initially interacted and contracted with IBSI rather than Infotech. We will, for ease of reference, nevertheless refer to that party only as "Infotech".

Infotech now moves for summary judgment in its favor and against Plaintiffs on all of the claims asserted against it.  (See dkt. entry no. 137, Motion; dkt. entry no. 137-1, Infotech Br.)  Plaintiffs oppose the Motion.  (Dkt. entry no. 149, Pls.' Opp'n Br.)[2]  Both Infotech and Plaintiffs have submitted argument concerning choice of law analysis.

The Court will resolve the Motion without oral argument pursuant to Local Civil Rule 78.1(b).

I.    **BACKGROUND**[3]

   **A.    The Plaintiffs**

Naples is a citizen of Connecticut.  (See Infotech SOF at ¶ 3; Pls.' Response to Infotech SOF at ¶ 3.)  She is the sole member and employee of TekDoc, a limited liability company organized under the

_____

[2] Ranbaxy separately moves for summary judgment in its favor and against Plaintiffs on all counts asserted against it.  (Dkt. entry no. 146, Ranbaxy Motion.)  Plaintiffs also oppose that motion.  (Dkt. entry no. 151, Pls.' Opp'n to Ranbaxy Motion.)  The Court will resolve the Ranbaxy Motion in a separate Memorandum Opinion.

[3] Plaintiffs and Infotech do not dispute the majority of the facts involved in this action.  (Compare dkt. entry no. 137-2, Infotech Statement of Undisputed Material Facts ("Infotech SOF") with dkt. entry no. 150, Pls.' Response to Infotech SOF; compare also dkt. entry no. 151, Pls.' Statement of Disputed Material Facts ("Pls.' SOF") with dkt. entry no. 156-2, Infotech Response to Pls.' SOF.)  The Court thus provides most citations to the parties' agreed upon statements of fact.  The Court, in the few instances where these parties dispute non-material facts, recites the facts in the light most favorable to Plaintiffs, draws inferences in Plaintiffs' favor, and cites directly to the evidence of record.  See Colgate-Palmolive Co. v. Tandem Indus., No. 10-4163, 2012 WL 1995021, at *1 n.2 (3d Cir. June 5, 2012).

laws of that state.  (Infotech SOF at ¶¶ 4-5; Pls.' Response to Infotech SOF at ¶¶ 4-5.)  It appears that Naples has worked in and has experience in the field of information technology ("IT").

**B.    Infotech & Ranbaxy**

Infotech is an IT company that, <u>inter alia</u>, contracts with clients to source independent IT professionals for temporary IT consulting assignments.  (<u>See</u> Infotech SOF at ¶ 9; Pls.' Response to Infotech SOF at ¶ 9.)  Infotech entered into such a contract in July of 2004 with Ranbaxy, a manufacturer of pharmaceutical products.  (Infotech SOF at ¶¶ 10-11; Pls.' Response to Infotech SOF at ¶¶ 10-11.)  Ranbaxy maintains its corporate headquarters in India and its administrative offices in Princeton, New Jersey. (<u>See</u> Infotech SOF at ¶ 2; Pls.' Response to Infotech SOF at ¶ 2.)

Infotech's contract with Ranbaxy, the "Master Services Agreement", provides in pertinent part that Infotech:

> shall provide Consultant(s) as necessary to perform the services identified in the corresponding Statement of Work ("Services").  Each Statement of Work ("SOW") shall specifically identify this Agreement and will set forth the project, the Services to be provided, length of assignment, name of Consultant(s), applicable billing rate and any other relevant information with regard to the provision of the Services.

(Dkt. entry no. 149-2, Sabatini Aff., Ex. 7, Master Services Agreement at ¶ 1.1.)  It also provides that:

> Consultant(s) shall not be deemed employees of the Ranbaxy [sic].  [Infotech] shall remain solely

3

> responsible for the Consultant's work performance,
> control and supervision, including matters relating to
> the quality and quantity of Consultant's [work product.]

(Id. at ¶ 2.2.)

### C. **Naples's Initial Interactions with Infotech & Ranbaxy**

In January of 2005, Infotech, acting pursuant to the Master Services Agreement, advertised on the internet that it sought a "validation specialist, contract to hire, temp to perm". (See Infotech SOF at ¶¶ 10, 12; Pls.' Response to Infotech SOF at ¶¶ 10, 12.) Naples saw the advertisement, forwarded her résumé to Infotech, and was thereafter contacted by Infotech recruiter Sanjay Bodduluri. (Infotech SOF at ¶¶ 12-13; Pls.' Response to Infotech SOF at ¶¶ 12-13.) Bodduluri explained that Infotech was recruiting independent contractors for a "temp to perm position as a validation manager" for Ranbaxy in Ranbaxy's Princeton facility. (See Infotech SOF at ¶¶ 14, 21; Pls.' Response to Infotech SOF at ¶¶ 14, 21.) Bodduluri further explained that Ranbaxy both: (1) preferred applicants who desired permanent employment with Ranbaxy; and (2) retained final decision-making authority regarding any potential conversion from temporary consultant to permanent employee. (Infotech SOF at ¶ 15; Pls.' Response to Infotech SOF at ¶ 15; Pls.' SOF at ¶¶ 2, 87; Infotech Response to Pls.' SOF at ¶¶ 2, 87.)

Naples was thereafter twice interviewed by Ranbaxy personnel. She first spoke with Ranbaxy's IT manager, Jeevan Rebba, by telephone, and she later met with both Rebba and Rebba's superior, Suneet Walia, at Ranbaxy's Princeton facility. (See Infotech SOF at ¶¶ 17-19, 22; Pls.' Response to Infotech SOF at ¶¶ 17-19, 22.) Rebba, during the phone interview, informed Naples that the available consulting position was "temp to perm" and that Ranbaxy would only consider applicants who were interested in permanent employment. (Infotech SOF at ¶ 17; Pls.' Response to Infotech SOF at ¶ 17.) Walia reiterated those points during Naples's in-person interview, and further informed Naples that Ranbaxy intended to convert the temporary consultant to a permanent employee after approximately six months. (Infotech SOF at ¶ 19; Pls.' Response to Infotech SOF at ¶ 19; Pls.' SOF at ¶¶ 3, 89; Infotech Response to Pls.' SOF at ¶¶ 3, 89.)

## D.   Naples's Understanding and Acceptance of the Ranbaxy Assignment

Bodduluri, following Naples's interviews with Rebba and Walia, contacted Naples, offered her a temporary consulting position at Ranbaxy, and informed her that Ranbaxy wanted her to begin work immediately. (See Infotech SOF at ¶ 22; Pls.' Response to Infotech SOF at ¶ 22.) Naples accepted the position by entering into a written contract, through TekDoc, with Infotech (the "Software Services Agreement"). (Infotech SOF at ¶ 24; Pls.' Response to

5

Infotech SOF at ¶ 24; dkt. entry no. 149-2, Sabatini Aff., Ex. 8,
Software Services Agreement at preface ("This Software Services
Agreement is part of the agreement made . . . by and between
[Infotech] and [TekDoc,] jointly on behalf of itself and its
personnel[.]").)  The Software Services Agreement provided, <u>inter
alia</u>, that:

### COMPENSATION FOR SERVICES

>          A.   Payment for services actually performed
> will be made in [the] corporate or business name of
> Contractor from time to time.  The payment amount to
> Contractor will be as reflected in the Purchase Order,
> Exhibit "A", which when signed by Contractor shall be
> incorporated herein in full by this reference thereto,
> and no other compensation in any form, including
> benefits, will be provided by [Infotech] or anyone else.

>          B.   If compensation is to be based on an
> hourly rate, Contractor shall maintain records of the
> hours that services have been performed, have a
> [Ranbaxy] representative verify those hours by signing
> the records, and submit to [Infotech] those records
> along with Contractor's invoice for the amount due to
> Contractor for the hours worked and verified.

(Software Services Agreement at ¶¶ 4(A)-(B).)  The first Purchase
Order, dated January 18, 2005 and signed by Naples on January 20,
2005 ("First Purchase Order"), recited that: (1) Naples's start
date was January 24, 2005; (2) the term of the contract was six
months, with the possibility of further extensions; and (3) Naples
would receive an hourly rate for her services, i.e., eighty-five
dollars per hour.  (Dkt. entry no. 149-2, Sabatini Aff., Ex. 8,

First Purchase Order.)  Naples thus understood that she would not receive payment from Infotech unless she submitted an invoice, accompanied by Ranbaxy-approved timesheets.  (See Infotech SOF at ¶ 33; Pls.' Response to Infotech SOF at ¶ 33.)

The Software Services Agreement also provides that:

**9.   LIABILITY INDEMNITY**

A.   Because of the Independent Status of Contractor and its personnel, Contractor is solely and completely accountable for the services it provides to Client . . . .  Contractor hereby releases [Infotech] from any liability relating to representations about the task requirements or to conditions under which Contractor may be performing services; those being negotiated by Contractor. . . .

B.   Further[,] because of the relationship to the subject matter of this Agreement, including, but not by way of limitation [Infotech] has no right to control any aspect of the project [on] which Contractor will be performing services, Contractor hereby indemnifies and holds [Infotech] . . . harmless from any and all liability, cost, expense, or other financial detriment, whether incurred or alleged, which Contractor, or its personnel may . . claim, directly or indirectly, due to its act or omission during the performance or non-performance of its services for or on behalf of [Ranbaxy.]

* * *

**14.  TERMS OF AGREEMENT**. . .

C.   The agreement . . . may be terminated by either party at any time without further obligation upon fourteen (14) days written notice to the other party.

15.  **MISCELLANEOUS:** This Agreement represents the entire Agreement of [Infotech] and Contractor and any modification thereof shall not be effective unless contained in a writing signed by both parties. . . . Contractor and Contractor's personnel represent that they and each of them, have read and understand the terms of this Agreement, have had an opportunity to ask any questions and to seek the assistance of their legal counsel, and are not relying upon any advice from [Infotech] in this regard.  This agreement shall be governed by [the] laws of Pennsylvania. . . .

(Software Services Agreement at ¶¶ 9(A)-(B), 14(C), 15.)

Naples was deposed twice in this action, and she testified at those depositions that she likely would not have accepted the temporary consulting assignment had it not been a "temp-to-perm" position, or if she had known that Ranbaxy had yet to establish the permanent position.  (Infotech SOF at ¶ 23; Pls.' Response to Infotech SOF at ¶ 23; Pls.' SOF at ¶¶ 3, 6; Infotech Response to Pls.' SOF at ¶¶ 3, 6.)  She also testified that, when she accepted the temporary consulting position, she understood that Ranbaxy wanted to observe her during the initial six month assignment (i.e., the term provided in the First Purchase Order) before deciding whether to hire her as a permanent employee.  (See Infotech SOF at ¶ 20; Pls.' Response to Infotech SOF at ¶ 20.)

E.   **Naples's Time at Ranbaxy in New Jersey**

Naples, Infotech, and Ranbaxy further extended Naples's term as a temporary consultant by "6 months with possible extensions" through a second Purchase Order, dated July 8, 2005 and signed by

8

Naples on July 27, 2005 ("Second Purchase Order").  (Dkt. entry no.
149-2, Sabatini Aff., Ex. 8, Second Purchase Order; see also
Infotech SOF at ¶ 30; Pls.' Response to Infotech SOF at ¶ 30.)  The
Second Purchase Order stated that "Contractor can terminate this
contract with 30 days['] written notice to the end client (Ranbaxy
Pharmaceutical)/[Infotech].  Where as end Client may terminate the
contract with or with out notice."  (Second Purchase Order; see
also Infotech SOF at ¶ 30; Pls.' Response to Infotech SOF at ¶ 30.)

    Naples, while working in New Jersey, lived in a hotel in New
Jersey three nights each week.  (Pls.' SOF at ¶ 14; Infotech
Response to Pls.' SOF at ¶ 14.)

   **F.   Naples's Assignment in India**

    Rebba approached Naples in October of 2005 and offered her an
assignment at Ranbaxy's facility in India.  (Infotech SOF at ¶ 34;
Pls.' Response to Infotech SOF at ¶ 34; see also Pls.' SOF at ¶ 18
("Naples was told that she was 'required' to go to India for a new
assignment . . .");  Infotech Response to Pls.' SOF at ¶ 18.)  Rebba
and Naples agreed that Naples, while in India, would work more than
eight hours per day.  (Infotech SOF at ¶ 49; Pls.' Response to
Infotech SOF at ¶ 49; Pls.' SOF at ¶¶ 33, 35; Infotech Response to
Pls.' SOF at ¶¶ 33, 35.)  They agreed that Naples would thus submit
invoices for the first eight hours per day that she worked, accrue
"comp time" for the ninth and tenth hours, and submit invoices for
anything beyond the tenth hour.  (Infotech SOF at ¶ 49; Pls.'

9

Response to Infotech SOF at ¶ 49; Pls.' SOF at ¶ 33; Infotech Response to Pls.' SOF at ¶ 33.)[4]  Rebba and Naples also discussed Ranbaxy's long-term intention to hire Naples as a permanent validation manager, and they discussed the terms of such employment.  (Infotech SOF at ¶ 36; Pls.' Response to Infotech SOF at ¶ 36; Pls.' SOF at ¶ 19; Infotech Response to Pls.' SOF at ¶ 19.)

Naples accepted the assignment in India, partly because she feared that she would otherwise forfeit her position as a temporary consultant and the possibility of permanent employment.  (Pls.' SOF at ¶ 61; Infotech Response to Pls.' SOF at ¶ 61; see also dkt. entry no. 137-5, Toss Aff., Ex. B, 10-27-08 Naples Dep. at 86; dkt. entry no. 137-6, Toss Aff., Ex. E, 3-8-11 Naples Dep. at 60-62.)[5]  She did not immediately inform Infotech of the assignment, or of her decision to accept it; she testified, however, that Infotech employees told her, in other circumstances, to "do whatever Ranbaxy told her to do."  (Infotech SOF at ¶¶ 40-41; Pls.' Response to Infotech SOF at ¶¶ 40-41; 10-27-08 Naples Dep. at 84-86.)  Naples

---

[4] Naples described "comp time" as time that she could accrue and apply toward future timesheets.  (See Infotech SOF at ¶ 50; Pls.' Response to Infotech SOF at ¶ 50.)

[5] Infotech and Plaintiffs separately submitted excerpts from Naples's 10-27-08 deposition.  The excerpts are not identical. (Compare 10-27-08 Naples Dep. with dkt. entry no. 149-2, Sabatini Aff., Ex. 2, 10-27-08 Naples Dep.)  Citations to the 10-27-08 Naples Deposition may relate to either of those submissions.

nonetheless understood that she could have declined the assignment. (See 3-8-11 Naples Dep. at 62.)

Ranbaxy's human resources department formally posted a job opening for a validation manager on October 27, 2005. (Infotech SOF at ¶¶ 38, 42; Pls.' Response to Infotech SOF at ¶¶ 38, 42; Pls.' SOF at ¶¶ 20, 90; Infotech Response to Pls.' SOF at ¶¶ 20, 90.) Naples interviewed for the job. (Pls.' SOF at ¶ 90; Infotech Response to Pls.' SOF at ¶ 90.)

### G. Naples's Time at Ranbaxy in India

#### 1. Ranbaxy Assumed Responsibility for Naples's Travel and Lodging While in India

Naples arrived in India on October 29, 2005. (Infotech SOF at ¶ 44; Pls.' Response to Infotech SOF at ¶ 44.) Prior to her arrival, Naples and Ranbaxy agreed that Ranbaxy would make and pay for all arrangements related to Naples's assignment in India, including housing. (Pls.' SOF at ¶ 24; Infotech Response to Pls.' SOF at ¶ 24.) Ranbaxy employees thus assisted Naples by selecting her departure date, helping her to obtain a visa, arranging transportation from the airport, and making her living arrangements. (Infotech SOF at ¶ 43; Pls.' Response to Infotech SOF at ¶ 43; Pls.' SOF at ¶¶ 23-27; Infotech Response to Pls.' SOF at ¶¶ 23-27.)

### 2.   Naples's Living and Working Conditions

Naples claims that she "suffered from deplorable working and living conditions" while on assignment in India "and wanted to escape." (Pls.' SOF at ¶ 63; Infotech Response to Pls.' SOF at ¶ 63.) Ranbaxy failed, despite its assurances to the contrary, to have a driver meet Naples at the airport and transport her to her lodging. (Pls.' SOF at ¶ 27; Infotech Response to Pls.' SOF at ¶ 27.) Ranbaxy also placed Naples in a guest house, whereas it placed other employees in hotels. (Pls.' SOF at ¶ 25; Infotech Response to Pls.' SOF at ¶ 25.) Naples, while staying at the guest house, lacked hot water and was unable to shower, suffered from bed bug attacks, and encountered large lizards. (Pls.' SOF at ¶¶ 37, 47; Infotech Response to Pls.' SOF at ¶¶ 37, 47.) She was told not to loiter outside the guest house because it was dangerous. (Pls.' SOF at ¶ 40; Infotech Response to Pls.' SOF at ¶ 40.)

Naples suffered from similar discomfort at work. Ranbaxy required Naples to work seven days per week and as many as twenty hours per day, barred her from taking breaks for either lunch or dinner, and did not allow her to make outgoing phone calls. (Pls.' SOF at ¶¶ 35, 50, 58; Infotech Response to Pls.' SOF at ¶¶ 35, 50, 58.)

### 3. Naples Complained to Ranbaxy about Her Living and Working Conditions

Naples complained to several Ranbaxy employees, including Rebba and Walia, about her working and living conditions. (Pls.' SOF at ¶¶ 41, 43-46, 49-52, 57-59; Infotech Response to Pls.' SOF at ¶¶ 41, 43-46, 49-52, 57-59.) Naples alleges that Ranbaxy, upon receiving her complaints, placed further controls on her and took her passport from her. (Pls.' SOF at ¶¶ 51, 53.; Infotech Response to Pls.' SOF at ¶¶ 51, 53.) Ranbaxy did move Naples from the guest house to a hotel, but Naples alleges that the hotel still constituted "dirty and substandard living conditions". (Pls.' SOF at ¶ 48; Infotech Response to Pls.' SOF at ¶ 48.)

### 4. Naples's Communications with Infotech

Naples, before leaving for India, did not advise Infotech either that Ranbaxy had asked her to go to India or that she had accepted Ranbaxy's assignment in India. (Infotech SOF at ¶ 41; Pls.' Response to Infotech SOF at ¶ 41.) Infotech did not, in fact, learn that Naples was in India until Naples responded to an Infotech e-mail regarding Naples's timesheets. (Infotech SOF at ¶ 42; Pls.' Response to Infotech SOF at ¶ 42.)

Naples alleges that Infotech was aware, based on her timesheets, that she was "working around the clock", but acknowledges that she did not notify Infotech of her other living and working conditions. (10-27-08 Naples Dep. at 158.) She

13

nonetheless infers that Infotech representatives were aware of those conditions because, as she alleges, Infotech representatives periodically met with Rebba.  (See, e.g., Pls.' SOF at ¶ 60 (citing Naples Aff. at ¶¶ 59, 62).)  When Naples attempted to raise and discuss the issues relating to her working and living conditions with Infotech, Infotech representatives told Naples that she could discuss pay-related issues with Infotech but should direct all other issues to Ranbaxy.  (Pls.' SOF at ¶ 55; Infotech Response to Pls.' SOF at ¶ 55; dkt. entry no. 149-2, Sabatini Aff., Ex. 5, Naples Aff. at ¶ 59.)

### 5.   Naples Extended her Stay in India

Ranbaxy employees asked Naples to extend her stay in India and indicated that refusing would result in forfeiture of both the temporary consulting position and the possibility of permanent employment.  (See Pls.' SOF at ¶ 61; Infotech Response to Pls.' SOF at ¶ 61.)  Naples, who still desired permanent employment, thus agreed to remain in India and stayed for a total of approximately seven weeks.  (Infotech SOF at ¶¶ 48, 51; Pls.' Response to Infotech SOF at ¶¶ 48, 51; Pls.' SOF at ¶¶ 62, 67; Infotech Response to Pls.' SOF at ¶¶ 62, 67.)  Naples neither informed Infotech of the extension nor sought Infotech's consult before agreeing to it.  (See Infotech SOF at ¶ 48; Pls.' Response to Infotech SOF at ¶ 48; 10-27-08 Naples Dep. at 125-26.)

14

**H.    Events Following Naples's Return to New Jersey**

Naples returned to New Jersey in late 2005.  (See Infotech SOF at ¶ 44 (establishing that Naples arrived in India on October 29, 2005); Pls.' Response to Infotech SOF at ¶ 44 (same); Pls.' SOF at ¶ 67 (establishing that Naples remained in India for approximately seven weeks); Infotech Response to Pls.' SOF at ¶ 67 (same).)  She learned, shortly after her return, that Ranbaxy had placed the permanent validation manager position "on hold".  (3-8-11 Naples Dep. at 127.)  Rebba informed her on January 6, 2006 that the position "would open up again in two weeks".  (Id.)  Rebba, per Naples, continually reassured Naples by telling her that the permanent validation manager position would open soon, and that she should not worry.  (Pls.' SOF at ¶ 74; Infotech Response to Pls.' SOF at ¶ 74.)

Naples did not, however, receive an offer for permanent employment at Ranbaxy.  Infotech contacted Naples by e-mail on January 16, 2006 and informed her both that: (1) Ranbaxy "can only provide" a third Purchase Order for "6 months . . . with good possibility of extension after 6 months"; and (2) "[a]bout joining them full time, at this stage they have ruled out that possibility."  (Dkt. entry no. 149-3, Sabatini Aff., Ex. 23, 1-16-06 E-mail Chain Between Naples and Infotech.)  Naples testified that Bidlur Shivaprakash, Infotech's president,

15

thereafter told her that she should accept the third Purchase Order because "the permanent position [would] open up again and [Naples would] be hired". (Pls.' SOF at ¶ 72; Infotech Response to Pls.' SOF at ¶ 72.)

Naples informed Shivaprakash in a January 18, 2006 e-mail that she would "go ahead and sign the six month contract. I'm enjoying the work, so I guess the other things will eventually fall in place." (1-16-06 E-mail Chain Between Naples and Infotech.) She signed the third Purchase Order ("Third Purchase Order") on January 24, 2006. (Infotech SOF at ¶ 31; Pls.' Response to Infotech SOF at ¶ 31; dkt. entry no. 137-6, Toss Aff., Ex. D, Third Purchase Order.) The Third Purchase Order, like the Second Purchase Order, stated that TekDoc could terminate the Software Services Agreement with thirty days' written notice to Ranbaxy, and that Ranbaxy could terminate the contract with or without written notice. (See id.)

## I.   Ranbaxy Terminated Naples's Employment as an Independent Consultant

Rebba contacted Naples on March 28, 2006, to inform her that April 21, 2006 would be her "roll-off" date, i.e., the last day that Ranbaxy would require her services as an independent consultant. (Dkt. entry no. 137-5, Toss Aff., Ex. F, 3-28-06 E-Mail from Rebba to Naples.) Rebba, in effect, informed Naples that Ranbaxy was terminating the Software Services Agreement. (See Pls.' SOF at ¶ 77; Infotech Response to Pls.' SOF at ¶ 77.)

16

Rebba cited, as reasons supporting the termination, "the projects on hand and also the project budget."  (3-28-06 E-Mail from Rebba to Naples.)

Naples was not, however, permitted to work at any Ranbaxy facility after Friday, March 31, 2006.  (Pls.' SOF at ¶ 78; Infotech Response to Pls.' SOF at ¶ 78.)  Shivaprakash of Infotech contacted Naples after she left work that day and informed her that it had been her last day with Ranbaxy.  (Pls.' SOF at ¶ 78; Infotech Response to Pls.' SOF at ¶ 78.)[6]  Naples, who of course had not until then been informed that it was her last day at Ranbaxy, had not submitted her final timesheets for approval and signature by Ranbaxy employees.  (Pls.' SOF at ¶ 79; Infotech Response to Pls.' SOF at ¶ 79.)

### J.   Naples's Unpaid Invoices

Naples, through TekDoc, submitted two invoices that are now at issue.  The first of these invoices, Invoice IBSI 1015 ("Invoice 1015"), claims $3,480.00 in wages for the week ending on April 2, 2006, i.e., the last week that Naples worked as an independent consultant at Ranbaxy.  (Infotech SOF at ¶ 57; Pls.' Response to Infotech SOF at ¶ 57.)  Naples submitted Invoice 1015 with an unsigned timesheet that set forth the hours that she allegedly worked and for which she sought payment.  (See Infotech SOF at

_____

[6] Naples asserts that Shivaprakash informed her that Ranbaxy terminated her contract because, inter alia, Naples complained about her living conditions in India.  (Naples Aff. at ¶ 60.)

¶¶ 57-58; Pls.' Response to Infotech SOF at ¶¶ 57-58.)  She has testified that Shivaprakash stated that he would meet with Rebba and have Rebba sign and approve that timesheet.  (10-27-08 Naples Dep. at 236.)

The second invoice at issue, Invoice IBSI 1017 ("Invoice 1017"), claims $17,400 "plus mileage reimbursement" over an unspecified period of time.  (Infotech SOF at ¶ 60; Pls.' Response to Infotech SOF at ¶ 60.)  The claim for $17,400 represents eighty hours of "Comp time for work in US", eighty hours of "Comp time for work in India", twenty-four hours of "Comp time for travel from US to India", and sixteen hours for "Comp time for Travel from India to US".  (Infotech SOF at ¶ 60; Pls.' Response to Infotech SOF at ¶ 60.)  Invoice 1017, like Invoice 1015, was accompanied by unsigned timesheets setting forth the hours that Naples allegedly worked and for which she sought payment.  (Infotech SOF at ¶ 61; Pls.' Response to Infotech SOF at ¶ 61.)

## II.  DISCUSSION

Infotech now moves for summary judgment in its favor and against Plaintiffs with respect to all of the claims asserted against it, i.e., Plaintiffs' claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) innocent misrepresentation; (5) fraud in the inducement; (6) negligent misrepresentation; (7) negligent

18

infliction of emotional distress; and (8) violations of CUTPA.
(See Motion; see also 2d Am. Compl. at 1-17 (setting forth claims
against Infotech).)  The Court, before addressing the merits of
those claims, will address the parties' choice of law analysis.

   **A.   Choice of Law Analysis**

   The Court has jurisdiction over this action pursuant to 28
U.S.C. § 1332 ("Section 1332").  (See 2d Am. Compl. at ¶¶ 1, 6
(demonstrating that the Court should deem both Naples and TekDoc to
be citizens of Connecticut and asserting jurisdiction pursuant to
Section 1332); Infotech SOF at ¶ 1 (demonstrating that the Court
should deem Infotech to be a citizen of both Delaware and New
Jersey); Pls.' Response to Infotech SOF at ¶ 2 (demonstrating that
the Court should deem Ranbaxy to be a citizen of both Delaware and
New Jersey.)  See also Zambelli Fireworks Mfg. Co., Inc. v. Wood,
592 F.3d 412, 418 (3d Cir. 2010) (stating that a "corporation is a
citizen both of the state where it is incorporated and of the state
where it has its principal place of business" and that "the
citizenship of a limited liability company . . . is determined by
the citizenship of each of its members.").  We recognize that the
United States District Court for the District of Connecticut
transferred the action to this Court pursuant to 28 U.S.C.
§ 1404(a) ("Section 1404(a)").  (See dkt. entry no. 74, Receipt of
Transfer Order; dkt. entry no. 71, 12-15-09 Order at 1, 14.)

"In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits."  Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 170 (3d Cir. 2011) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  A federal court receiving a case by transfer under Section 1404(a) must, however, apply the same choice of law analysis that the transferor court would apply.  Ferens v. John Deere Co., 494 U.S. 516, 524-31; Amica, 656 F.3d at 171.  The Court will thus apply Connecticut's choice of law rules, the same rules that the United States District Court for the District of Connecticut would have applied had it retained this action.  See Amica, 656 F.3d at 171.

Connecticut courts "apply an individualized choice of law analysis" to each of the litigants' claims.  Macomber v. Travelers Prop. & Cas. Corp., 894 A.2d 240, 256 (Conn. 2006).  "The threshold choice of law issue in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case.  If not, there is no need to perform a choice of law analysis, and the law common to the jurisdiction should be applied."  Cohen v. Roll-A-Cover, LLC, 27 A.3d 1, 16 (Conn. App.), certification denied, 33 A.3d 739 (Conn. 2011) (citation omitted).

1.   **Choice of Law Relating to Plaintiffs' Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

Connecticut courts have adopted Section 187 of the Restatement (Second) of Conflicts of Law, and recognize that parties to a contract generally are allowed to select the law that will govern their contract.  See Elgar v. Elgar, 679 A.2d 937, 943-44 (Conn. 1996); see also Zenon v. R.E. Yeagher Mgmt. Corp., 748 A.2d 900, 903 (Conn. App. 2000) ("Contract[] clauses which require the application of laws of other states upon breach or dispute are recognized as proper in Connecticut.").  A valid choice of law clause will thus bind the parties unless: (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice"; or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state" that (a) in the absence of the parties' choice of law clause and pursuant to Section 188 of the Restatement (Second) of Conflicts of Law, would be the state of the applicable law, and (b) "has a materially greater interest than the chosen state in the determination of the particular issue".  Elgar, 679 A.2d at 943; Restatement (Second) of Conflicts of Law § 187 (1988).

Both Plaintiffs and Infotech recognize that they selected Pennsylvania law as the law that governs the Software Services

Agreement.  (Infotech Br. at 5, 7-8; dkt. entry no. 149, Pls.'
Opp'n Br. at 13-14; see Software Services Agreement at ¶ 15 ("This
agreement shall be governed by [the] laws of Pennsylvania.").)
They thus agree that Pennsylvania law controls Plaintiffs' claim
for breach of the Software Services Agreement.  (Infotech Br. at
5, 7-8; Pls.' Opp'n Br. at 13-14.)  See also Elgar, 679 A.2d at
943-44; Zenon, 748 A.2d at 903.[7]

They disagree, however, as to the law that controls
Plaintiffs' claim for breach of the implied covenant of good faith
and fair dealing ("the Implied Covenant Claim").  Infotech asserts
without citation to legal authority that Pennsylvania law governs
the Implied Covenant Claim because that claim rises from the
Software Services Agreement.  (Infotech Br. at 5, 8.)  Plaintiffs,
by contrast, assert that Connecticut law governs the Implied
Covenant Claim because it "is a contract claim arising out of an
agreement separate and apart from the Software Services Agreement."
(Pls.' Opp'n Br. at 14.)

Plaintiffs fail, however, to support their argument because
they fail to demonstrate the relationship between the Implied

---

[7] Plaintiffs assert, however, that some aspects of the breach
of contract claim arise not from the Software Services Agreement
but, instead, from the Master Services Agreement.  The Master
Services Agreement "is governed by the laws of New Jersey without
regard to conflict of laws."  (Master Services Agreement at 2.)
The Court will accordingly apply New Jersey law to the aspects of
the breach of contract claim arising from the Master Services
Agreement.

Covenant Claim and any agreements that exist "separate and apart from the Software Services Agreement."  They have to the contrary relied upon evidence and argument that demonstrate that the Implied Covenant Claim is inexorably related to the Software Services Agreement.  (See id. at 15 (analyzing choice of law based upon Plaintiffs' state contacts while negotiating, contracting, and performing services pursuant to the Software Services Agreement).)

It appears, as discussed in detail below, that a "breach of the covenant of good faith . . . is a breach of contract action, not an independent action for a breach of a duty of good faith and fair dealing."  McHolme/Waynesburg LLC v. Wal-Mart Real Estate Bus. Trust, No. 08-961, 2009 WL 1292808, at *2 (W.D. Pa. May 7, 2009). As it appears both as a matter of law and, as the parties demonstrate, as a matter of fact that the Implied Covenant Claim arises from and relates directly to the Software Services Agreement, the Court concludes that Pennsylvania law governs that claim.

### 2. Choice of Law Relating to Plaintiffs' Unjust Enrichment Claim

It appears, for the reasons set forth below in Section II.B.2.c of this Memorandum Opinion, that Plaintiffs have withdrawn the unjust enrichment claim asserted against Infotech.  The Court, accordingly, need not expound upon choice of law issues relating to that claim.

### 3.    Choice of Law Relating to Plaintiffs' Tort Claims

Connecticut courts, when analyzing choice of law relating to tort claims, generally apply "the law of the state in which the plaintiff was injured, unless to do so would produce an arbitrary or irrational result." <u>Macomber</u>, 894 A.2d at 257.  Plaintiffs here allege that their injuries occurred in New Jersey or were otherwise directly caused by their continued business relationship with Ranbaxy in Princeton, New Jersey.  (<u>See</u> Pls.' Opp'n Br. at 16.) Plaintiffs thus argue that their tort claims -- that is, their claims for innocent misrepresentation, fraud in the inducement, negligent misrepresentation, and negligent infliction of emotional distress -- should be resolved under New Jersey law.  (<u>Id.</u>) Infotech argues that Connecticut law should apply to each of these claims, but acknowledges that no outcome determinative difference exists between applicable New Jersey and Connecticut law. (Infotech Br. at 8-12.)

### a.    Plaintiffs' Innocent Misrepresentation Claim

The Court has carefully considered the parties' choice of law arguments as they pertain to Plaintiffs' claim for innocent misrepresentation, and has conducted its own research of New Jersey and Connecticut law pertaining to such claims.  We now conclude, for the reasons that follow, that neither state recognizes an independent claim of innocent misrepresentation.

The parties have not cited and the Court has been unable to find any Connecticut cases that recognize an independent claim of "innocent misrepresentation".  Connecticut courts instead allow plaintiffs to premise negligent misrepresentation claims upon innocent misrepresentations, i.e., upon innocently uttered but nonetheless false statements.  See, e.g., Barton v. City of Bristol, 967 A.2d 482, 493 (Conn. 2009) (stating, during analysis of negligent misrepresentation claim, "that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, or ought to know, or has the duty of knowing the truth.")  The Court would thus, if applying Connecticut law to the innocent misrepresentation claim, grant judgment in Infotech's favor as it is duplicative of Plaintiffs' separately raised claim for negligent misrepresentation.

The parties similarly failed to cite and the Court has been unable to find any New Jersey cases that recognize an independent claim or cause of action for "innocent misrepresentation".  Plaintiffs assert, by reference to TIG Ins. Co. v. Privilege Care Mktg., Inc., No. 03-3747, 2005 WL 994581 (D.N.J. Apr. 27, 2005) and Ledley v. William Penn Life Ins. Co., 651 A.2d 92 (N.J. 1995), that New Jersey courts recognize such claims under the theory of equitable fraud.  But these and related cases merely recognize innocent misrepresentations as a basis for equitable rescission of

contracts (most commonly, contracts for life insurance or transfers of interest in real property).  See, e.g., Ledley, 651 A.2d at 635. New Jersey courts do not recognize innocent misrepresentation as an independent cause of action.  Commercial Cas. Ins. Co. v. S. Sur. Co. of Des Moines, Iowa, 100 N.J. Eq. 92, 96, 135 A. 511 (Ch. 1926) ("misrepresentation without intent to deceive will not sustain an action at law").

> **b.    Choice of Law Relating to Plaintiffs' Claims for Fraud in the Inducement, Negligent Misrepresentation, and Negligent Infliction of Emotional Distress**

The Court has examined the parties' choice of law arguments pertaining to Plaintiffs' claims for fraud in the inducement, negligent misrepresentation, and negligent infliction of emotional distress.  (See Infotech Br. at 8-12; Pls.' Opp'n Br. at 15-17.) The parties have respectively stated and we agree that the laws of New Jersey and Connecticut do not present an outcome determinative conflict.  We will accordingly apply New Jersey law -- the law of the state where Plaintiffs claim injury, and the law common to both states -- to each of these claims.  See Macomber, 894 A.2d at 257; Cohen, 27 A.3d at 16.

> **4.    Choice of Law Relating to Plaintiffs' CUTPA Claim**

Infotech and Plaintiffs agree that Connecticut law necessarily governs Plaintiffs' CUTPA claim.  Because CUTPA is a Connecticut statute, we agree and will apply Connecticut law to that claim.

B.    **The Motion**

1.    **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a). The Court will thus grant a motion for summary judgment when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party", and a fact is "material" if it might affect the outcome of the suit under the applicable rule of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court will not deny a motion for summary judgment based upon mere allegations or denials in the pleadings; the parties must, instead, produce some evidence to support each material fact.  Fed.R.Civ.P. 56(c)(1)(A); United States v. Premises Known as 717 S. Woodward Street, 2 F.3d 529, 533 (3d Cir. 1993).  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party's speculation and conjecture will not defeat a motion

for summary judgment.  See Kovalev v. City of Phila., 362 Fed.Appx. 330, 331 (3d Cir. 2010).

> ### 2.  Discussion

> #### a.  Breach of Contract

Plaintiffs premise their breach of contract claim on Infotech's failure to remit payment upon Invoice 1015, failure to remit payment upon Invoice 1017, failure to timely pay TekDoc for services rendered between October 2005 and December 2005, and "failure to assist Naples when she was treated poorly in India." (See Pls.' Opp'n Br. at 18, 21.)  They also allege that Infotech breached the Software Services Agreement by failing "to provide permanent employment".  (2d Am. Compl. at ¶ 19(c).)

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action . . . establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)).  A plaintiff must, to prove damages, provide sufficient evidence from which damages may be calculated "to a reasonable certainty".  Ware, 322 F.3d at 226-27 (internal quotation marks and citation omitted).  "At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague or contingent

upon some unknown factor." Id. at 227 (internal quotation marks and citation omitted).

Infotech argues, as a preliminary matter, that Naples cannot properly raise a breach of contract claim against it because Naples was not a party to the Software Services Agreement. (Infotech Br. at 12.) The Pennsylvania Supreme Court looks to Section 302 of the Restatement (Second) of Contracts when analyzing third party beneficiary claims. Scarpitti v. Weborg, 609 A.2d 147, 150 (Pa. 1992). That court has thus held that "a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself," unless: (1) "the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties"; and (2) "performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Id. at 150-51.

The Court, upon consideration of the Software Services Agreement, has thus concluded that Naples has standing to pursue a breach of contract claim against Infotech because she is a third party beneficiary to the Software Services Agreement. That agreement expressly evinces Infotech's and TekDoc's intent to

29

benefit Naples.  (See generally Software Services Agreement.)  See also Scarpitti, 609 A.2d at 150.  TekDoc entered into that agreement "jointly on behalf of itself and its personnel", i.e., its sole member and employee, Naples.  (Software Services Agreement at preface (emphasis added).)  The several purchase orders appended to the Software Services Agreement specify that Naples is the "Personnel contracted for this Task".  (See, e.g., Third Purchase Order.)

We will now address the several bases for Plaintiffs' breach of contract claim.

### i.   Invoice 1015 & Invoice 1017

Plaintiffs argue that Infotech breached the Software Services Agreement by failing to remit payment upon Invoice 1015 and Invoice 1017.  Infotech argues in response that Plaintiffs failed to meet a condition precedent to payment because Plaintiffs failed to submit a properly signed and verified timesheet with either of those invoices.  (Infotech Br. at 16.)

It appears, however, that the Court need not resolve the Motion insofar as it concerns Invoice 1015 and Invoice 1017. Plaintiffs, while the Motion was pending, withdrew claims asserted against Infotech and Ranbaxy that related to Invoice 1015.  (See dkt. entry no. 159, 8-15-12 Stipulation & Order at ¶¶ 2, 4 (acknowledging settlement of claims related to "payment of the

. . . unpaid amount of . . . Invoice IBSI 1015" and withdrawing those claims from the Second Amended Complaint).)  They also seemingly withdrew claims asserted against Infotech and Ranbaxy that related to Invoice 1017.  (See id. at ¶¶ 1, 4 (acknowledging settlement of claims related to pay for, inter alia, "comp time" and travel time to and from India, and withdrawing those claims from the Second Amended Complaint).)

Because the 8-15-12 Stipulation & Order effectively renders the Motion moot insofar as the Motion concerns Invoice 1015 and Invoice 1017, the Court will not further comment on it.

### ii.   Payment for Services Rendered Between October 2005 and December 2005

Plaintiffs also allege that Infotech is liable to Plaintiffs for its alleged failure to remit timely payment to TekDoc for services that Naples provided to Ranbaxy between October 2005 and December 2005.  (Pls.' Opp'n Br. at 20.)  They assert that Infotech, pursuant to each of the three Purchase Orders, was obliged to remit payment upon valid invoices in "net 40 days".  (See, e.g., Third Purchase Order.)  Infotech, however, now moves for summary judgment in its favor and against Plaintiffs on this aspect of the breach of contract claim.  (See Motion at 1.)[8]  It appears that Infotech is entitled to summary judgment in its favor

---

[8] Plaintiffs earlier received notice that Infotech moves for summary judgment "on all claims", including this aspect of the breach of contract claim.  (See Motion at 1.)

on this aspect of the breach of contract claim because Plaintiffs have failed to produce some evidence to support each material fact that supports this claim, including "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." <u>Premises Known as 717 S. Woodward Street</u>, 2 F.3d at 533 (non-movant must produce some evidence to support each material fact); <u>Ware</u>, 322 F.3d at 225 (reciting elements of breach of contract claim under Pennsylvania law).

Plaintiffs have failed to introduce evidence demonstrating that Infotech breached the parties' contract by failing to remit timely payment.  They contend that Naples provided services between October of 2005 and December of 2005, and further contend that they did not receive payment from Infotech until March of 2006.  (Pls.' Opp'n Br. at 20.)  These contentions, however, do not demonstrate that Infotech breached its contract with Plaintiffs.  Intotech's duty to remit payment did not arise until Infotech received a "valid invoice" from TekDoc.  (<u>See, e.g.</u>, Third Purchase Order.) Plaintiffs, by failing to produce evidence demonstrating: (1) when Infotech received such invoices, and (2) that Infotech failed to remit payment within forty days of receipt, have failed to support this aspect of the breach of contract claim.

Plaintiffs have also failed to introduce evidence demonstrating that they suffered damage as a result of Infotech's alleged failure to remit timely payment to TekDoc for services that Naples provided to Ranbaxy between October 2005 and December 2005. We acknowledge that Plaintiffs have summarized their purported damages, and included this summary as an exhibit in their opposition to the Motion.  (See generally dkt. entry no. 149-3, Sabatini Aff., Ex. 24, Pls.' Summary of Alleged Damages.)  We note, however, that none of the categories of damages set forth in that document relate to this aspect of the breach of contract claim.

### iii.   Infotech's Alleged "Failure to Assist Naples When She Was Treated Poorly in India"

Plaintiffs allege that Infotech is liable for breach of contract because it failed to inform Naples of, warn Naples of, respond to Naples's complaints about, and assist Naples's efforts to improve her living and working conditions in India.  (2d Am. Compl. at ¶ 19(a)-(q).)  Infotech now argues in support of the Motion that, pursuant to the Software Services Agreement, it was not responsible for either Naples's day-to-day working conditions or her travel and living arrangements.  (See Infotech Br. at 13-15; Infotech Reply Br. at 4.)

Plaintiffs do not directly dispute Infotech's argument.  (See generally Pls.' Opp'n Br. at 22-24.)  They contend, however, that

Plaintiffs were third party beneficiaries to the contract between Infotech and Ranbaxy, the Master Services Agreement.  They further contend that the Master Services Agreement established Infotech's relevant duties because Infotech therein agreed to "remain solely responsible for the Consultant's work performance, control and supervision, including matters relating to the quality and quantity of the Consultant's" work product.  (Id. at 22 (quoting Master Services Agreement at ¶ 2.2).)

The Court has reviewed the record and now concludes that Plaintiffs cannot assert a breach of contract claim against Infotech for the alleged wrongs relating to Naples's living and working conditions in India.  Our decision rests on four bases.

First, the Court concludes that Plaintiffs are not third party beneficiaries to the Master Services Agreement and, thus, lack standing to pursue this aspect of the breach of contract claim. The parties to the Master Services Agreement, Infotech and Ranbaxy, explicitly disclaimed any intent to confer third party beneficiary status on Plaintiffs by stating that "[n]o provision of [the Master Services Agreement] shall be deemed to confer upon a third party any remedy, claim, liability, reimbursement, cause of action, or other right whatsoever."  (Master Services Agreement at 2.)  See also Werrmann v. Aratusa, Ltd., 630 A.2d 302, 305 (N.J. App. Div. 1993) ("To determine whether a person qualifies as a third-party

beneficiary, the test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts[.]"). The contract between Infotech and Ranbaxy similarly fails to confer third party beneficiary status on Plaintiffs because (1) Infotech's performance under that contract would not satisfy "an obligation of [Ranbaxy] to pay money to [Plaintiffs]", and (2) neither that contract nor the evidence produced in response to the Motion evinces Ranbaxy's intent to give Plaintiffs the benefit of Infotech's performance thereunder. (See Master Services Agreement at 2.) Werrman, 630 A.2d at 305.[9]

Second, even assuming that the Master Services Agreement confers third party beneficiary status on Plaintiffs, the Court finds that the cited portion of the Master Services Agreement does not relate to and thus does not create a contractual duty relating to Naples's living and working conditions in India. (See Master Services Agreement at ¶ 2.2.) Paragraph 2.2 of the Master Services Agreement merely requires Infotech to assume responsibility for each consultant's "work performance, control and supervision" and "the quality and quantity of" their work product. (See id.) See also Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 592 A.2d

---

[9] Plaintiffs' argument for third party beneficiary status rests solely on the plain language of the Master Services Agreement. (See Pls.' Opp'n Br. at 22-24.) They have not cited or referenced other evidence of record that tends to show that Ranbaxy intended to give Plaintiffs the benefit of Infotech's performance under Paragraph 2.2 of the Master Services Agreement.

647, 650 (N.J. App. Div.) ("[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."). The Court may not interpret the plain meaning of the words in that paragraph to create duties that did not previously exist; the Court has no right to rewrite the parties' contract. See id.

Third, it appears that Plaintiffs, through the Software Services Agreement, expressly disclaimed any liability that Infotech might have had for Naples's living and working conditions in India.  Plaintiffs and Infotech agreed to release Infotech "from any liability relating to representations about the task requirements or to conditions under which Contractor may be performing services; those being negotiated by Contractor." (Software Services Agreement at ¶ 9(A) (emphasis added).)

Fourth, even assuming that Plaintiffs had standing to pursue this claim, that the Master Services Contract supported this claim, and that Plaintiffs had not absolved Infotech of liability, the Court would find that this claim nonetheless fails as a matter of law.  Plaintiffs have not provided sufficient evidence from which damages relating to this aspect of the breach of contract claim could be proven "to a reasonable certainty".  See Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 921 A.2d 1100, 1105, 1108 (N.J. 2007).

### iv. Infotech's Alleged Failure to Provide Permanent Employment

Plaintiffs allege in the Second Amended Complaint that Infotech breached its agreement with Plaintiffs by "fail[ing] to provide permanent employment". (2d Am. Compl. at ¶ 19(c).) Infotech argues that it did not, through the Software Services Agreement or elsewhere, promise to provide permanent employment. (See Infotech Br. at 15-16.) Plaintiffs did not respond to this argument. (See generally Pls.' Opp'n Br.) Infotech has thus made a showing of entitlement to summary judgment in its favor, because Plaintiffs have not demonstrated that a contract exists that entitles Plaintiffs to permanent employment. See Ware, 322 F.3d at 225 (setting forth elements of breach of contract claims under Pennsylvania law).

### b. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege in the Second Amended Complaint that Infotech breached the implied covenant of good faith and fair dealing by failing to meet its "obligation to treat the plaintiff fairly and to perform [its] contractual duties in good faith", and by "engag[ing] in a design to mislead or to deceive" Plaintiffs by "neglect[ing] or refus[ing] to perform [its] duties." This claim, as explained in Plaintiffs' opposition to the Motion, is premised on five factual bases, i.e., Infotech's: (1) failure to timely

remit payment for Naples's work between October 2005 and December 2005; (2) failure to remit payment on Invoice 1015 and Invoice 1017; (3) failure to address Naples's living and working conditions in India; (4) termination of the Software Services Agreement; and (5) representations that Naples would, if she signed the Second Purchase Order and Third Purchase Order, become a permanent Ranbaxy employee.  (Pls.' Opp'n Br. at 29-30.)

Infotech argues that Pennsylvania does not recognize a cause of action, separate and apart from breach of contract, for breach of an implied covenant of good faith and fair dealing.  (Infotech Br. at 20-21; Infotech Reply Br. at 7-9.)  The Court agrees.  "The majority of Pennsylvania cases through the 1990s to today . . . have refused to permit independent claims for breach of the covenant of good faith outside of an insurer-insured relationship. Thus, in general, a breach of such covenant is a breach of contract action, not an independent action for a breach of a duty of good faith and fair dealing."  McHolme/Waynesburg, 2009 WL 1292808, at *2 (quoting Seth William Goren, Looking for Law in all the Wrong Places: Problems in Applying the Implied Covenant of Good Faith Performance, 37 U.S.F. L. Rev. 257, 303 (2003)); see also Seiple v. Cmty. Hosp. of Lancaster, No. 97-8107, 1998 WL 175593, at *2 (E.D. Pa. Apr. 4, 1998) ("Pennsylvania does not recognize a claim for breach of covenant of good faith and fair dealing as an independent

38

cause of action."); LSI Title Agency, Inc. v. Evaluation Servs., Inc., 951 A.2d 384, 391-92 (Pa. Super. 2008) (holding that claims for breach of implied covenant and fair dealing are subsumed by concurrently raised claims for breach of contract); JHE, Inc. v. Se. Pa. Transp. Auth., No. 1790 NOV.TERM 2001, 2002 WL 1018941, at *5 (Pa. Ct. Com. Pl. May 17, 2002) ("[T]he implied covenant of good faith does not allow for a claim separate and distinct from a breach of contract claim.  Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself.").

### c.   Unjust Enrichment

Plaintiffs also "seek[] to recover the value of services performed for and on behalf of [Infotech] for which [Plaintiffs] ha[ve] not been compensated" under a theory of unjust enrichment. (2d Am. Compl. at ¶ 28.)  It appears that Plaintiffs seek recovery for the services related to and billed under Invoice 1015 and Invoice 1017.[10]  It thus appears that the unjust enrichment claim, like the breach of contract claim (insofar as that claim related to

---

[10] The basis of Plaintiffs' unjust enrichment claim is, at best, ambiguous.  Plaintiffs have not further defined the factual basis of this claim in either the Second Amended Complaint or their opposition to the Motion.  The Court has, however, conducted a thorough review of the record and has not identified any "services . . . for which [Plaintiffs] ha[ve] not been compensated" other than those related to Invoice 1015 and Invoice 1017.

Invoice 1015 and Invoice 1017), has been mooted by the 8-15-12 Stipulation & Order.

The Court, in light of the 8-15-12 Stipulation & Order, will accordingly consider the unjust enrichment claim withdrawn and the Motion, insofar as it concerns that claim, moot.  The Court will not further comment on the unjust enrichment claim.

### d.    Fraud in the Inducement

Plaintiffs aver in the Second Amended Complaint that Infotech fraudulently induced Plaintiffs to enter into the Software Services Agreement, enter into subsequent Purchase Orders, and accept Ranbaxy's assignment in India by promising: (1) timely payment for work performed; (2) a permanent position with Ranbaxy; and (3) that Naples would, while in India, receive treatment comparable to that received by other Ranbaxy employees.  (2d Am. Compl. at ¶ 26.) Infotech now moves for summary judgment in its favor with respect to each of these alleged promises.  (See Infotech Br. at 18-20.)

A claim for fraud in the inducement that seeks legal relief, under New Jersey law, sounds in common-law fraud.  See Microbilt Corp. v. L2C, Inc., No. A-3141-09T3, 2011 WL 3667645, at *3 (N.J. App. Div. Aug. 23, 2011).[11]  The elements of common-law fraud are: "(1) a material misrepresentation" of fact; "(2) knowledge or

---

[11]   New Jersey courts also recognize fraud in the inducement as an equitable remedy that may serve as the basis for rescission of a contract.  See, e.g., Merchs. Indem. Corp. v. Eggleston, 179 A.2d 505, 513 (N.J. 1962).  Here, however, Plaintiffs seek only legal relief.

belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person"; and (5) damages. <u>Gennari v. Weichert Co. Realtors</u>, 691 A.2d 350, 367 (N.J. 1997). "A misrepresentation amounting to actual legal fraud" will generally "consist[] of a material representation of a <u>presently</u> <u>existing</u> <u>or</u> <u>past</u> fact". <u>Jewish Ctr. of Sussex Cnty. v. Whale</u>, 432 A.2d 521, 524 (N.J. 1981) (emphasis added). It may also consist of a material misrepresentation that concerns future intent or events, if the statement is made with the intent to deceive. <u>See</u> <u>Notch View Assocs. v. Smith</u>, 615 A.2d 676, 682 (N.J. Super. 1992) (statement as to future event has been held to constitute actionable misrepresentation when "the defendant [has] ... no intention at the time he makes the statement of fulfilling the promise."). "However, predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true." <u>Alexander v. CIGNA Corp.</u>, 991 F.Supp. 427, 435 (D.N.J.), <u>aff'd</u>, 172 F.3d 859 (3d Cir. 1998). This is particularly so where a "contractual provision flatly contradictory to prior oral assurances", because it would be "manifestly unreasonable" for "most people -- and particularly experienced, knowledgeable business people --" to rely on oral assurances when confronted by a contradictory written contract. <u>Id.</u> at 436.

41

The Court, upon consideration of the Motion, concludes that Infotech is entitled to summary judgment with respect to the first and third of the alleged promises at issue.  Infotech argues that it did not, acting through Shivaprakash or other employees, make any misrepresentations about its contractual duty to remit payment to Plaintiffs.  (Infotech Br. at 19.)  Infotech also argues that it did not learn of Naples's assignment in India until Naples had traveled to India, and thus could not and did not make any material misrepresentations relating to her living and working conditions in that country.  Id.  (See also Infotech SOF at ¶¶ 41-42; Pls.' Response to Infotech SOF at ¶¶ 41-42.)  Plaintiffs have not responded to these arguments, have failed to point the Court to evidence of record to support those aspects of the fraud claim, and, thus, seemingly abandon those aspects of the fraud claim. (See generally Pls.' Opp'n Br.)  See also Premises Known as 717 S. Woodward Street, 2 F.3d at 533 (non-movant must produce some evidence to support each material fact).

The Court also concludes that Infotech is entitled to summary judgment in its favor and against Plaintiffs with respect to the second of the alleged promises at issue, i.e., the alleged promise of permanent employment with Ranbaxy.  Plaintiffs have not provided the Court with competent evidence of material misrepresentations of fact.  See Gennari, 691 A.2d at 367; see also Premises Known as 717

42

S. Woodward Street, 2 F.3d at 533.   Plaintiffs argue that Infotech

fraudulently induced Naples to sign the Software Services Agreement

by describing the temporary consulting position as "temp to perm",

and similarly argue that Infotech fraudulently induced Naples to

sign the Third Purchase Order by telling her that Ranbaxy would

soon make her a permanent employee.  (Pls.' Opp'n Br. at 24.)

Plaintiffs further argue that Infotech made such statements with

knowledge that those statements were false.  (Id.)  They support

these arguments, however, only by reference to Naples's self-

serving speculation and conjecture.  (Id. (citing various portions

of Naples's deposition testimony and her affidavit).)  Such

speculation and conjecture are not sufficient to defeat the Motion.

See Kovalev, 362 Fed.Appx. at 331.

    Plaintiffs, further, have failed to produce evidence to

support the fourth element of the fraud in the inducement claim,

i.e., that she reasonably relied on Infotech's statements.  See

Gennari, 691 A.2d at 367.  Naples initially learned from Bodduluri,

an Infotech employee, that the temporary consulting position was

"temp to perm" and that Ranbaxy retained final decision-making

authority regarding any possibility of permanent employment.

(Infotech SOF at ¶ 15; Pls.' Response to Infotech SOF at ¶ 15;

Pls.' SOF at ¶¶ 2, 87; Infotech Response to Pls.' SOF at ¶¶ 2, 87.)

She thereafter signed the Software Services Agreement and the First

43

Purchase Order, which specified that her "period of performance" was merely "6 month[s] with <u>possible</u> extensions".  (First Purchase Order (emphasis added).)  It would thus be, as noted above, "manifestly unreasonable" for Naples -- a sophisticated IT professional who operated and managed a limited liability company -- to rely on Infotech's alleged promises of permanent employment.  See <u>Alexander</u>, 991 F.Supp. at 435.

It would similarly be "manifestly unreasonable" for Naples to rely on any statements concerning permanent employment made before she signed the Third Purchase Order.  See <u>id.</u>  Naples, before signing the Third Purchase Order, learned from Shivaprakash of Infotech both that: (1) the Third Purchase Order would provide only for "6 months . . . with good possibility of extension after 6 months"; and (2) "[a]bout joining them full time, at this stage they have ruled out that possibility." (1-16-06 E-mail Chain Between Naples and Infotech.)[12]  Naples testified that Shivaprakash thereafter told her that she should accept the Third Purchase Order because "the permanent position [would] open up again and [she

_____

[12] Naples, during this exchange, asked Shivaprakash about Ranbaxy's intention to hire her as a permanent employee.  (1-16-06 E-mail Between Naples and Infotech.)  Shivaprakash responded that Ranbaxy had not foreclosed the possibility of hiring Naples as a permanent employee.  (<u>Id.</u>)  He also stated, however, that Ranbaxy wanted only "to give a 6 month contract at this point as discussed with the current terms."  (<u>Id.</u>)  Those terms, of course, included Ranbaxy's right to terminate Naples's employment at any time, without notice.  (Third Purchase Order.)

would] be hired".   (Pls.' SOF at ¶ 72; Infotech Response to Pls.'

SOF at ¶ 72.)   But Naples had the opportunity to read the plain

text of the Third Purchase Order, which stated that the period of

performance, as before, was "6 months with possible extensions".

(Third Purchase Order (emphasis added).)   The Third Purchase Order

also plainly stated that the "end Client", Ranbaxy, could

"terminate the contract with or with out [sic] notice."   Naples,

given her general experience as a sophisticated businessperson, her

knowledge that Ranbaxy had "ruled out [the] possibility" of

permanent employment, and her specific experience as a contractor

for Ranbaxy, could not reasonably have relied on any of the oral

assurances of permanent employment here at issue.   See Alexander,

991 F.Supp. at 435.

### e.   Negligent Misrepresentation

Plaintiffs raise a negligent misrepresentation claim against

Infotech, which arises from the same facts as the fraud in the

inducement claim.   (See 2d Am. Compl. at ¶ 33; see also Pls.' Opp'n

Br. at 26 (demonstrating that factual basis of claim is Infotech's

statements regarding both the "temp to perm" nature of the

temporary consulting position and Naples's opportunities for

permanent employment at Ranbaxy).)   Negligent misrepresentation

claims are quite similar to common-law fraud claims.   Dayrit v.

Mem'l Hosp. of Salem, No. A-0232-10T4, 2012 WL 1987096, at *7 (N.J.

App. Div. June 5, 2012).  A plaintiff stating a claim under New Jersey law for negligent misrepresentation must demonstrate that: (1) the defendant negligently made an incorrect statement; (2) the plaintiff justifiably relied on that statement; and (3) the plaintiff, as a consequence of that reliance, suffered damages. Kaufman v. i-Stat Corp., 754 A.2d 1188, 1195 (N.J. 2000); see also Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc., 617 F.3d 207, 218 (3d Cir. 2010).  In a negligent misrepresentation claim, as in a fraud claim, "[r]eliance is not reasonable where the substance of the alleged misstatement is contradictory of the undertakings expressly dealt with by the written contract."  Luso Fuel Inc. v. BP Prods. N. Am., Inc., No. 08-3947, 2009 WL 1873583, at *5 (D.N.J. June 29, 2009).

The Court has considered the evidence offered by Plaintiffs in support of the negligent misrepresentation claim, and now concludes that such evidence is insufficient to support the claim.  We accordingly conclude that Infotech is entitled to judgment in its favor and against Plaintiffs on the negligent misrepresentation claim.

Our conclusion rests on two bases.  First, Plaintiffs have failed to produce competent evidence to demonstrate that Infotech negligently made the statements at issue.  Plaintiffs assert that Infotech either knew or should have known when making such

statements that they were false.  (Pls.' Opp'n Br. at 26.)  They
have failed, however, to offer any evidence beyond Naples's self-
serving speculation and conjecture to support such claims.  Such
speculation and conjecture, as noted above, cannot save Plaintiffs'
claims from summary judgment.  See Kovalev, 362 Fed.Appx. at 331.

Second, we conclude that Plaintiffs have failed to demonstrate
that Naples justifiably relied on Infotech's alleged statements.
As discussion in Section II.B.2.d of this Memorandum Opinion,
Naples could not reasonably or justifiably rely on Infotech's
statements because the terms of the Purchase Orders dealt with and
contradicted those statements.  Luso Fuel Inc., 2009 WL 1873583, at
*5.  Those Purchase Orders clearly stated that Plaintiffs' terms of
employment were limited (1) to terms of "6 months with possible
extensions", and (2) by Ranbaxy's power to terminate her employment
at any time, with or without notice.  (See, e.g., Third Purchase
Order.)  Naples, in light of these contractual limitations, could
not as a matter of law reasonably have relied on the alleged
promise of continued employment, whether temporary or permanent.
(See id.)  See also Luso Fuel Inc., 2009 WL 1873583, at *5.

### f.   Negligent Infliction of Emotional Distress

Plaintiffs next raise a negligent infliction of emotional
distress claim against Infotech, stating that Infotech:

> a. . . . knew or should have known that Naples had
> to work and live under substandard conditions and knew

or should have known about the dangerous conditions
existing in India;
     b. . . . knew or should have known that Naples was
not being treated in the same manner as Ranbaxy
employees;
     c. . . . ignored complaints made by Naples;
     d. . . . allowed the conditions to continue
without taking any action to correct the same;
     e. . . . failed to pay her what she was due;

(2d Am. Compl. at ¶ 42.)  They also allege that Infotech caused

Plaintiffs to suffer emotional distress by terminating the Software

Services Agreement in a manner "which created an unreasonable and

foreseeable risk of causing Naples emotional distress likely to

lead to illness or bodily harm."  (Id. at ¶ 43.)[13]

Negligent infliction of emotional distress "can be understood

as negligent conduct that is the proximate cause of emotional

distress in a person to whom the actor owes a legal duty to

exercise reasonable care."  Decker v. Princeton Packet, Inc., 561

A.2d 1122, 1128 (N.J. 1989).  A plaintiff, to properly raise a

claim for this tort, must accordingly demonstrate that: (1) the

defendant owed a duty of reasonable care to plaintiff;

(2) the defendant breached that duty; (3) the plaintiff suffered

severe emotional distress; and (4) the defendant's breach of duty

was the proximate cause of the plaintiff's severe emotional

---

[13] Plaintiffs allege for the first time in their opposition to
the Motion that Infotech negligently inflicted emotional distress
upon Plaintiffs by "breaching a contract in bad faith, fraudulently
inducing the plaintiffs to rely upon negligent misrepresentations
and violating CUTPA".  Because these claims do not appear in the
Second Amended Complaint, we will not now address them.

distress.  Dello Russo v. Nagel, 817 A.2d 426, 435 (N.J. App. Div. 2003).  "[R]ecovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons."  Decker, 561 A.2d at 430; see also Dello Russo, 817 A.2d at 435 ("Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed.").

We initially conclude that this claim must fail as a matter of law inasmuch as it is raised by TekDoc.  Business organizations cannot experience emotions and, as such, cannot experience emotional distress.  Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37 n.2 (1st Cir. 2000) ("Because corporations, unlike natural persons, have no emotions, they cannot press claims for intentional infliction of emotional distress."); F.D.I.C. v. Hulsey, 22 F.3d 1472, 1489 (10th Cir. 1994) ("Since a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress."); Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co., 792 F.2d 1036, 1039 n.2 (11th Cir. 1986) ("corporations cannot experience emotional distress"); HM Hotel Props. v. Peerless Indem. Ins. Co., No. 12-548, 2012 WL 2300615, at *3 (D. Ariz. June 18, 2012) ("a corporate plaintiff cannot suffer

emotional distress because 'a corporation lacks the cognizant ability to experience emotions.'").[14]

This claim also fails inasmuch as it is raised by Naples. Naples claims that Infotech caused her severe emotional distress by failing to act upon her complaints regarding her living and working conditions in India. (2d Am. Compl. at ¶ 42(a)-(d).) We conclude, however, that Infotech did not owe Naples a duty to provide or address those conditions. Naples has admitted that she accepted the assignment in India from Ranbaxy, without discussing the opportunity with or otherwise notifying Infotech. (Infotech SOF at ¶¶ 34, 40-41; Pls.' Response to Infotech SOF at ¶¶ 34, 40-41; 10-27-08 Naples Dep. at 84-86.) Naples has further admitted that she and Ranbaxy reached a separate agreement -- that is, separate from the Software Services Agreement -- under which Ranbaxy agreed to provide transportation and accommodations for Naples. (Infotech SOF at ¶ 43; Pls.' Response to Infotech SOF at ¶ 43; Pls.' SOF at ¶¶ 23-27; Infotech Response to Pls.' SOF at ¶¶ 23-27.) Infotech, based on these facts, did not owe Naples a duty to receive or act on her complaints about the same.

---

[14]   We recognize that these cases resolved issues concerning corporations and that TekDoc is, by contrast, a limited liability company. We see no reason, however, to differentiate between corporations and limited liability companies in this respect.

Naples also alleges that Infotech negligently caused her to suffer emotional distress because Infotech failed to remit payments and terminated her employment in the manner described in Sections I.I and II.B.2.a of this Memorandum Opinion.  (See 2d Am. Compl. at ¶¶ 42(e), 43.)  Neither allegation properly supports this claim because neither of the actions at issue demonstrate that Infotech breached a duty to Naples and thus caused her emotional distress. See Decker, 561 A.2d at 1128.  The mere failure to remit payment upon either Invoice 1015 or Invoice 1017 cannot "cause genuine and substantial emotional distress or mental harm to average persons." See Decker, 561 A.2d at 430; see also Picogna v. Bd. of Educ., 671 A.2d 1035, 1036 (N.J. 1996) (recognizing that breach of contract may cause emotional distress only where such breach is sufficiently "outrageous", and citing cases involving outrageous behavior).  It also appears that mere communication of termination of employment cannot support a claim for emotional distress.[15]

---

[15] It appears that New Jersey courts have not addressed negligent infliction of emotional distress claims arising from termination of employment.  The majority of courts that have addressed the issue, however, disfavor such claims.  See Conaway v. Control Data Corp., 955 F.2d 358, 360 (5th Cir. 1992) (applying Texas law);  Gill v. Trans World Airlines, Inc., No. 88-894, 1988 WL 62517, at *3 (D.N.J. June 14, 1988) (applying New York law); Parsons v. United Techs. Corp., Sikorsky Aircraft Div., 700 A.2d 655, 667 (Conn. 1997); Hanly v. Riverside Methodist Hosp., 603 N.E.2d 1126, 1133 (Ohio App. 1991); but see Shoen v. Amerco, Inc., 896 P.2d 469, 477 (Nev. 1995).

### g.   CUTPA

Plaintiffs allege that Infotech violated CUTPA.  (See 2d Am.
Compl. at ¶¶ 35-40; Pls.' Opp'n Br. at 30-31.)   CUTPA provides that
"[n]o person shall engage in unfair methods of competition and
unfair or deceptive acts or practices in the conduct of any trade
or commerce."  C.G.S. § 42-110b(a).  A finding of unfairness
depends on "(1) whether the practice, without necessarily having
been previously considered unlawful, offends public policy as it
has been established by statutes, the common law, or otherwise--
whether, in other words, it is within at least the penumbra of some
common law, statutory, or other established concept of unfairness;
(2) whether it is immoral, unethical, oppressive, or unscrupulous;
[or] (3) whether it causes substantial injury to consumers".
Conaway v. Prestia, 464 A.2d 847, 852 (Conn. 1983) (citation and
quotation marks omitted) (interpreting CUTPA by reference to
interpretation of Section 5(a)(1) of the Federal Trade Commission
Act, 15 U.S.C. § 41, et seq.).

Plaintiffs premise the CUTPA claim on the breach of contract,
breach of the implied covenant of good faith and fair dealing,
unjust enrichment, and tort claims discussed above.  (Pls.' Opp'n
Br. at 30-31.)  Plaintiffs, by failing to carry their burden with
respect to those claims, also fail to carry their burden with
respect to the CUTPA claim.

**III. CONCLUSION**

The Court, for the reasons detailed above, will grant the parts of the Motion that are not moot.  The Court will issue an appropriate Order and Judgment.


                                    s/ Mary L. Cooper
                                    **MARY L. COOPER**
                                    United States District Judge


Dated:    August 16, 2012